**JOY MANUFACTURING COMPANY, Plaintiff,**

v.

**CGM VALVE & GAUGE CO., INC. and American Energy Valve, Inc., Defendants.**

**Civ. A. No. CA–H–85–6950.**

United States District Court,
S.D. Texas,
Houston Division.

May 30, 1989.

Final Judgment Aug. 3, 1989.

Amended Final Judgment Nov. 15, 1989.

Alan D. Rosenthal, Thomas H. Adolph, Richard S. Siluk, Baker & Botts, Houston, Tex., for plaintiff.

Charles R. Dunn, Richard P. Hill, Dunn, Kacal, Adams, Pappas & Law, Houston, Tex., for defendants.

HOYT, District Judge.

The plaintiff, Joy Manufacturing Company,[1] brought this suit against CGM Valve & Gauge Co., Inc. ("CGM") and American Energy Valve, Inc. ("AEV") on the following claims:

(1) federal trademark infringement under 15 U.S.C. § 1114(1) (Count I of the complaint);

(2) the use of counterfeit marks under 15 U.S.C. §§ 1116(d) and 1117(b) (Count II of the complaint);

(3) patent infringement under 35 U.S.C. § 271 (Count VI of the complaint);

(4) false marking under the patent laws, 35 U.S.C. § 292 (Count VII of the complaint); and

---

1. After this suit was filed, Cooper Industries, an Ohio corporation, acquired the WKM Division of Joy Manufacturing Company, and it is the present owner of all of the trademark, patent and copyright properties in suit. For convenience, the action has been continued under the names of the original parties pursuant to Rule 25(c), Fed.R.Civ.P. However, the Court notes that Cooper Industries is the real party in interest in the position of plaintiff.

(5) copyright infringement under 17 U.S.C. §§ 106 and 501 (Count VIII of the complaint).

Counts III to V of the complaint have been dropped, and a settlement has been reached as to one of the patents in suit. As to the remaining claims, the Court finds that the plaintiff is entitled to injunctive relief, to an award of damages, the defendants' profits, costs and attorneys' fees, and to prejudgment and postjudgment interest.

## I. FINDINGS OF FACT

A. *Trademark Infringement and the Use of Counterfeit Marks by CGM.*

1. For many years, the plaintiff and its predecessors have been engaged in the manufacture and sale of valves in interstate commerce and throughout the world under the marks "WKM" and "W–K–M" (the "WKM" marks). (PX 1–4) By virtue of this long and continuous use, the marks have become widely known and recognized in the valve industry and are assets of substantial value to the plaintiff.

2. The plaintiff owns the following U.S. trademark registrations for the WKM marks for valves, valve parts and related products, and for the repair, remanufacture, testing, reconditioning and servicing of valves and valve parts:

| Mark | Registration No. | Date |
| --- | --- | --- |
| W–K–M | 400,326 | March 2, 1943 |
| W–K–M | 658,203 | February 11, 1958 |
| WKM | 675,862 | March 24, 1959 |
| W–K–M | 1,155,072 | May 19, 1981 |

These registrations are incontestable under 15 U.S.C. § 1065.

3. Defendant CGM is engaged, among other things, in the business of buying and selling used and surplus valves, which are reconditioned or repaired by CGM prior to sale. Many of those valves have undergone substantial wear and deterioration, so that they require the remachining or replacement of parts before they can be resold.

4. Among the used and surplus valves that are reconditioned and sold by CGM are valves that were originally manufactured and sold by the plaintiff or its predecessor under the WKM marks. After reworking the used or surplus WKM valves, CGM's practice is to clean and paint the valves and to affix new, unauthorized WKM nameplates to make them look like new WKM valves. The valves are not marked as used or surplus valves, and prior to this lawsuit the valves were not marked to show that they had been reconditioned or remanufactured by CGM. The valves are sold by CGM as WKM valves, even though neither the plaintiff nor its predecessor has any part in reconditioning the valves. The evidence shows that CGM has sometimes sold such reconditioned valves as new WKM valves.

5. CGM's records show that it purchased from a nameplate manufacturer at least 1,821 unauthorized WKM nameplates, only 595 of which remain. (PX 10, 11, 12, 14, 63, Pat Elliott Testimony) In light of the evidence introduced at the trial and the lack of any other plausible explanation, the Court infers that the other majority of the 1,226 nameplates were used on valves that were sold by CGM.

6. CGM also has placed on its valves the monogram of the American Petroleum Institute (the "API"), an institution that sets standards for the oil industry. The use of the API monogram is permitted only after screening and authorization by the API. Although CGM has never been authorized to use the API monogram, it has affixed that monogram to the unauthorized WKM nameplates used on its reconditioned valves. This practice gives the impression that the reconditioned valves are genuine WKM valves that meet API standards.

7. CGM sells its reconditioned valves as the original article even though many of the valves, after reworking by CGM, no longer meet the specifications of the original manufacturer. This practice creates an unreasonable risk of damage to property or of injury or death to nearby persons. The evidence shows that if a valve is used at a working pressure for which it is not suited, it can lead to an explosive valve failure. CGM's unauthorized use of the plaintiff's trademarks on such valves is likely to result in irreparable injury to the plaintiff's reputation and goodwill.

8. The Court finds that as a result of the activities of companies such as CGM selling counterfeit valves, WKM has been forced to institute a strict policy of marking and etching each WKM part for traceability and determinations of authenticity. This additional practice has resulted in increased expense to plaintiff.

9. The Court finds that CGM's actions have been willful and deliberate. The evidence shows a systematic pattern of such activities by CGM. This is not the first time that CGM has been sued for using counterfeit nameplates on reconditioned valves or for selling used valves as new valves. As a result of other lawsuits against CGM, CGM was fully aware that these practices are unlawful. Nevertheless, even after being enjoined from such acts in a number of cases, CGM has continued to use counterfeit nameplates of other valve manufacturers on its reconditioned valves.

10. The Court finds that the deliberate and willful nature of CGM's actions is also evidenced in other activities. Ed Carney of Export Oilfield testified that Larry Elliott, Vice President of CGM, and a salesman of CGM represented that WKM valves purchased by Export Oilfield from CGM were new, unused WKM valves when in fact the valves were used, reconditioned valves having counterfeit nameplates. Sam Gonzalez, an investigator hired by plaintiff to purchase WKM valves from CGM, testified that he placed a purchase with CGM for new valves. The purchase order submitted to CGM by this investigator specified that the valve must be new. Lew Babbidge, an employee of plaintiff, testified at the preliminary injunction hearing that the valves delivered to the WKM investigator were used, reconditioned valves. Further, the valves delivered bore nameplates misrepresenting the metal of which the valves were made.

11. The willful and deliberate nature of CGM's actions is also evidenced by the fact that CGM, at one time before 1983, stamped all remanufactured valves with CGM logo. (Pat Elliott testimony, PX 67) When CGM ceased this practice, it contin-ued to repaint its remanufactured valves with the manufacturer's colors and with counterfeit nameplates. By preparing its remanufactured valves in this way, CGM enabled itself, or alternatively, CGM enabled its own customers, to sell the remanufactured WKM valves as new, unused WKM valves. The president of CGM, Pat Elliott, admitted that in fact some of CGM's customers have sold CGM remanufactured valves as factory new valves.

12. The evidence also shows that CGM's president, when questioned by Cooper Industries about the use of unauthorized nameplates bearing Cooper's DEMCO trademark, originally denied that CGM had such nameplates. (PX 112) At the time, CGM had in its possession counterfeit DEMCO nameplates and had used a large number of them on its remanufactured valves.

13. The evidence shows that CGM has violated the preliminary injunction that was entered in this case on April 7, 1986. (Pat Elliott testimony) Under the terms of that injunction, CGM was enjoined from selling or distributing any valves bearing the WKM trademarks unless they were new, unused, and unreconditioned valves, or unless they bore nameplates permanently affixed to the valve bodies prominently displaying substantially the following notice:

THIS VALVE DISMANTLED, INSPECTED AND REMANUFACTURED BY CGM VALVE CO., INC.

Although CGM has continued to sell remanufactured WKM valves since that time, it has never used the form of nameplate required by the preliminary injunction.

14. From December 31, 1983 through April 7, 1986, CGM sold 195 remanufactured valves and received sales revenue from these valves of $251,824.40. From April 7, 1986 to the present, CGM has sold at least 122 WKM remanufactured valves and received a sales revenue of $262,-544.50. CGM introduced no evidence at trial of its expenses in connection with any of its sales of WKM remanufactured valves.

B. *Patent Infringement by AEV.*

15. Plaintiff is the owner of U.S. Patent No. 4,477,055 (the "'055 patent") for a top-entry ball valve. (PX 6) The '055 patent was issued by the U.S. Patent & Trademark Office on October 16, 1984.

16. In May 1984, before the '055 patent had issued, defendant AEV hired JDS Engineering to help AEV design and manufacture a copy of the plaintiff's top-entry ball valve. Sometime in late 1984 or early 1985, AEV began selling those valves to the public. The valves made and sold by AEV are substantially identical to the plaintiff's patented valve and fall directly within the claims of the '055 patent.

17. The plaintiff's predecessor gave AEV notice of the '055 patent and its relevance to the AEV valve. However, AEV made no changes to its valve after receiving that notice. AEV is still making and selling its copies of the plaintiff's patented valve.

18. Defendants submitted to the Court a large number of patents relating to valves. Each of these patents was considered by the Patent & Trademark Office in a request for reexamination proceeding during 1988. After considering the patents, the Patent & Trademark Office determined that the patents were merely cumulative of the patents which had been considered by the Examiner, and the Patent & Trademark Office denied the request for reexamination. (PX 109, 110)

19. Marvin Beasley is an engineer who was the owner of JDS Engineering. Mr. Beasley designed the AEV valve seat which is accused of infringement. Mr. Beasley admitted that he was provided with four WKM valves to measure. He was directed to design a top-entry ball valve which would be similar in appearance to the WKM valve and which would have parts which would be interchangeable with the WKM valve. The valve and valve seat as designed by Mr. Beasley complied with this objective. AEV's purpose in designing such a valve was to take a part of the market share of WKM, which AEV considered to be the leader in the top-entry ball valve business.

20. Beasley, working for AEV, designed a ball valve seat which Beasley admitted at trial contained each of the elements of Claims 1, 8, and 14 of the '055 patent, the three independent claims of that patent. Beasley and AEV considered the valve seat to be so novel that they hired a patent attorney, Al Kimball, to prepare a patent application on the valve seat. (PX 86–1 and 86–2) This patent application was prepared for filing with the Patent & Trademark Office, but the application was abandoned when AEV and Beasley learned of the '055 patent.

21. Defendants introduced no evidence as to the distinction between the patent and the prior art and no evidence as to whether persons skilled in the art would have considered any differences between the prior art and the patented invention to be obvious. Defendants have failed to overcome the presumption of validity. Mr. Beasley testified that the two-piece valve seat solved a problem which had plagued the valve industry for years, i.e., retention of the soft seal piece in the valve seat. Mr. Beasley testified that persons skilled in the art include persons with college degrees in engineering, as well as persons with masters or doctorates in engineering.

22. The two-piece valve seat designed by Mr. Beasley for AEV has been used by AEV in its valves ranging in size from 2" to 12". AEV's sales of these valves through 1987 total $5,759,402.00. AEV did not produce any documentation of its sales after 1987.

23. The Court finds that the customary and reasonable license in the valve industry for inventions and patents similar to the '055 patent is approximately 5% of valve sales. Plaintiff has entered into at least one license under the Partridge patent which includes a royalty of 5% of valve sales. Mr. Ron Wilkins, an employee of plaintiff, testified that he was knowledgeable of the industry practice and of reasonable royalties in the industry, and he further testified that a reasonable licensor and a reasonable licensee would negotiate a royalty of 5% of valve sales for a license under the '055 patent. The Court finds

**1394**

that a reasonable royalty under the '055 patent would be 5% of valve sales and that a reasonable royalty on AEV's valve sales through 1987 would be $287,970.10. AEV has continued to sell these valves since 1987 to the present.

### C. False Patent Marking by AEV.

24. AEV has admitted that it used the words "patent pending" in advertising its copy of the plaintiff's valve, even though AEV had not filed a patent application. AEV continued to use the term "patent pending" in its advertising even after this suit was filed.

### D. Copyright Infringement by AEV.

25. Plaintiff owns the copyright to a brochure entitled "Introducing A High Pressure Ball Valve That Never Has To Leave The Line ..."

26. AEV has produced and distributed a brochure containing material that is substantially similar to the material in the plaintiff's copyrighted brochure. AEV had access to the plaintiff's copyrighted brochure, and the Court finds that AEV has copied from the plaintiff's copyrighted brochure.

27. Any conclusion of law that constitutes a finding of fact or a mixed question of law and fact is incorporated as a finding of fact.

## II. CONCLUSIONS OF LAW

### A. Trademark Infringement and the Use of Counterfeit Marks by CGM.

1. Under 15 U.S.C. § 1115(b), the plaintiff's federal trademark registrations are conclusive evidence of its exclusive rights to use the marks "WKM" and "W–K–M" in commerce for valves and the related products and services covered by the registrations. See Park 'N Fly v. Dollar Park & Fly, 469 U.S. 189, 191–92, 105 S.Ct. 658, 660–61, 83 L.Ed.2d 582 (1985). Since the plaintiff's exclusive rights to those marks are conclusively established as a matter of law, the only issues that remain are those relating to the alleged infringement by CGM.

2. Trademark infringement occurs whenever any person uses in commerce without the consent of the registrant "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). The basic test for infringement therefore is the "likelihood of confusion." Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha, 754 F.2d 591, 594 (5th Cir.1985); Sun–Fun Prods. v. Suntan Research & Dev., 656 F.2d 186, 189 (5th Cir.1981). Actual confusion is not necessary. Id. at 191.

3. The likelihood of confusion is not limited to confusion at the initial point of sale; it can be at any point in the chain of distribution or ownership, including post-sale confusion of third parties who later encounter the product. Lois Sportswear, USA v. Levi Strauss & Co., 799 F.2d 867, 872 (2d Cir.1986); Rolex Watch USA v. Forrester, 2 U.S.P.Q.2d 1292, 1295, 1986 WL 15668 (S.D.Fla.1986). The likelihood of confusion also is not limited to confusion as to the source of a product. The use of a mark in a manner which suggests an affiliation with the trademark owner, or which causes a likelihood of confusion as to sponsorship or endorsement, also constitutes infringement. Fuji Photo, 754 F.2d at 596.

4. When a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods constitutes immediate and irreparable harm, regardless of the actual quality of the defendant's goods. The injury lies in the fact that the plaintiff no longer can control its own reputation and goodwill. American Rice, Inc. v. Arkansas Rice Growers Coop. Ass'n, 532 F.Supp. 1376, 1389 (S.D.Tex. 1982), aff'd, 701 F.2d 408 (5th Cir.1983).

5. This case involves a well-recognized category of trademark infringement, involving goods that originally were made by one party and that later were repaired or reconditioned by another party and re-

sold under the original marks. It is well settled that repaired or reconditioned goods bearing the original trademark must be clearly marked to show that they have been repaired or reconditioned. *See Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 130, 67 S.Ct. 1136, 1139, 91 L.Ed. 1386 (1947); *Singer Mfg. Co. v. Briley*, 207 F.2d 519, 522 (5th Cir.1953); *Green v. Electric Vacuum Cleaner Co.*, 132 F.2d 312, 314 (6th Cir.1942); *Cutler–Hammer, Inc. v. Universal Relay Corp.*, 285 F.Supp. 636 (S.D.N.Y.1968); *Singer Mfg. Co. v. American Appliance Co.*, 86 F.Supp. 737 (N.D. Ohio 1949).

6. In this case, CGM has gone further than to repair or recondition the plaintiff's WKM valves. CGM has refurbished and painted the valves and affixed unauthorized new nameplates to make the valves look like new valves. By using unauthorized WKM nameplates on its reconditioned valves and by failing to mark its valves as used or reconditioned, CGM's actions create a substantial likelihood of confusion as to the true status of the valves. The plaintiff therefore is entitled to an injunction under 15 U.S.C. § 1116.

7. The plaintiff also is entitled to recover its damages, CGM's profits, and the costs of this action under 15 U.S.C. § 1117(a). Because CGM's actions were willful, the plaintiff is entitled to recover all of CGM's profits from any infringing sales, regardless of whether the use of the plaintiff's mark was a causal factor in the sale. *See Truck Equip. Serv. Co. v. Freuhauf Corp.*, 536 F.2d 1210 (8th Cir.1976); *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656 (2d Cir.1970); *Stuart v. Collins*, 489 F.Supp. 827 (S.D.N.Y.1980). Furthermore, in light of CGM's continuing history of the kind of conduct at issue in this case and the willfulness of its acts, the damages and profits awarded to the plaintiff will be trebled. *See Holiday Inns v. Airport Holiday Corp.*, 493 F.Supp. 1025, 1028 (N.D. Tex.1980), *aff'd*, 683 F.2d 931 (5th Cir. 1982).

8. Pursuant to 15 U.S.C. § 1117, plaintiff was required only to prove the amount of CGM's sales, and CGM was required to prove all elements of cost or deduction claimed. CGM failed to prove or offer to prove any elements of cost or deduction claimed; therefore, plaintiff is entitled to an award of the full amount of CGM's sales, which was $251,824.40.

9. The willfulness of CGM's acts makes this an exceptional case under 15 U.S.C. § 1117(a), and the plaintiff is entitled to recover its reasonable attorneys' fees. *See Playboy Enterprises v. Baccarat Clothing Co.*, 692 F.2d 1272, 1276 (9th Cir.1982); *Quaker State Oil Refining Corp. v. Kooltone, Inc.*, 649 F.2d 94, 95 (2d Cir.1981); *Playboy Enterprises v. P.K. Sorren Export Co.*, 546 F.Supp. 987 (S.D. Fla.1982).

10. Treble damages and attorneys' fees will be awarded to the plaintiff for another reason. In 1984 the Lanham Act was amended by the Trademark Counterfeiting Act of 1984. The Lanham Act now provides that, in assessing damages for trademark infringement,

[T]he court *shall,* unless the court finds extenuating circumstances, enter judgment for three times [the defendant's] profits or [the plaintiff's] damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of section 32(1)(a) of this Act … that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark … in connection with the sale, offering for sale, or distribution of goods or services.

15 U.S.C. § 1117(b) (emphasis added). The court also has discretion to award prejudgment interest at the rate established under section 6621 of the Internal Revenue Code of 1954 from the date of service of the pleadings until the entry of judgment, or for such shorter period as the court deems appropriate. *Id.*

11. A "counterfeit mark" is defined as:

[A] counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is

in use, whether or not the person against whom relief is sought knew such mark was so registered.

15 U.S.C. § 1116(d)(1)(B)(i). The term "counterfeit" in turn is defined as follows:

A "counterfeit" is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.

15 U.S.C. § 1127.

12. The unauthorized WKM nameplates affixed by CGM to its reconditioned valves contain spurious marks that are identical with or substantially indistinguishable from the plaintiff's registered trademarks. Since the spurious WKM marks have been used by CGM for the same goods or services for which they are registered in the U.S. Patent and Trademark Office, the marks are counterfeit marks under the Lanham Act. Because CGM knew that the marks and the nameplates that it used were counterfeit, the plaintiff is entitled to a mandatory award of treble damages or profits, whichever is greater, to prejudgment and postjudgment interest, and to its reasonable attorneys' fees.

### B. *Patent Infringement by AEV.*

13. In order to be patentable, an invention must be *novel,* in the sense that it did not already exist and had not been disclosed in the "prior art" at the time of the invention, and *nonobvious,* meaning that at the time the invention was made, it would not have been obvious to a person having ordinary skill in the art to which it pertains. 35 U.S.C. §§ 102, 103. A person of ordinary skill in the art is "presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate." *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 454 (Fed.Cir.1985).

14. When the plaintiff's '055 patent was granted, the issues of novelty and nonobviousness were resolved by the U.S. Patent and Trademark Office (the "PTO") in favor of patentability. The patent therefore is presumed to be valid, and the burden of proof is on AEV to show that it is not. 35 U.S.C. § 282.

15. AEV has the burden of proving by clear and convincing evidence the invalidity of each patent claim that it contends is invalid. *Custom Accessories v. Jeffrey–Allan Indus.,* 807 F.2d 955, 961 (Fed.Cir.1986); *see also Kaufman Co. v. Lantech, Inc.,* 807 F.2d 970, 973 (Fed.Cir. 1986); *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 872 (Fed.Cir.1986); *SSIH Equip., S.A. v. USITC,* 718 F.2d 365, 375 (Fed.Cir. 1983). Moreover, the presumption of validity of the patent remains the same and the burden of proving invalidity remains on AEV throughout the litigation, even as to prior art that was not considered by the patent examiner. *Kaufman Co.,* 807 F.2d at 973 (citing *Jervis B. Webb Co. v. Southern Sys.,* 742 F.2d 1388, 1392 (Fed.Cir. 1984)).

16. AEV contends that it has found "new" prior art that renders the '055 patent invalid. However, when the plaintiff informed the PTO of the prior art cited by AEV and asked the PTO to reexamine the patent in view of that art, the PTO concluded that there was no need to reexamine the patent because no new issues of patentability were raised by those references. Further, it was not until AEV was notified of the '055 patent that AEV abandoned its own patent application on the AEV valve seat. That designer, Mr. Beasley, indicated that he believed that the valve seat solved a problem which had plagued the valve industry for years. Therefore, after considering the evidence presented, including the prior art cited by AEV, the Court finds that AEV has not shown by clear and convincing evidence that the '055 patent is invalid for obviousness or lack of novelty.

17. Objective evidence that an invention was not obvious to a person of ordinary skill in the art includes evidence of (1) commercial success of the invention; (2) longfelt but unresolved need in the industry; (3) failure of others to satisfy that need; and (4) copying of the invention. *Custom Accessories v. Jeffrey–Allan Indus.,* 807 F.2d 955, 960 (Fed.Cir.1986); *see also Pentec, Inc. v. Graphic Controls Corp.,* 776 F.2d 309, 316–17 (Fed.Cir.1985),

and *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1000 (Fed.Cir.), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986). The presence of one or more of these factors tends to show that the invention was not obvious to one of ordinary skill in the art at the time it was made.

18. The evidence shows that the invention covered by the '055 patent has been commercially successful. This is a strong factor favoring a finding of nonobviousness. *Under Sea Indus. v. Dacor Corp.*, 833 F.2d 1551, 1559 (Fed.Cir.1987); *see also Allen Archery, Inc. v. Browning Mfg.*, 819 F.2d 1087, 1092 (Fed.Cir.1987). AEV has failed to show that the commercial success of the invention was due to extraneous factors. *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387 (Fed.Cir.1988).

19. AEV's copying of the patented valve design further supports the nonobviousness of the invention. "Copying the claimed invention, rather than one within the public domain, is indicative of nonobviousness." *Windsurfing Int'l*, 782 F.2d at 1000; *see also Allen Archery*, 819 F.2d at 1092; *Dow Chem. Co. v. American Cyanamid Co.*, 816 F.2d 617, 622 (Fed.Cir. 1987).

20. For the reasons stated above, the Court finds that the '055 patent is valid.

21. AEV also contends that the '055 patent is invalid because the applicant failed to disclose all of the prior art to the PTO. All that needs to be disclosed, however, is "material" information. There is "no duty to transmit information which is not material to the examination of the application." 37 C.F.R. § 1.56(b). Thus, there is no obligation to disclose a reference to the PTO merely because the applicant knew of or should have been aware of that reference. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1362 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

22. As mentioned above, the plaintiff requested a reexamination of the '055 patent by the PTO in light of the prior art cited by AEV. After considering those references, the PTO concluded that no new issues of patentability were presented. The PTO apparently considered the references cited by AEV to be merely cumulative of prior art previously cited, and therefore not material to patentability. *See Rolls–Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1107 (Fed.Cir.1986); *see also FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed.Cir.1987). The Court finds that AEV has failed to show by clear and convincing evidence that the applicant failed to cite material prior art to the PTO.

23. AEV's charge of "inequitable conduct" fails for the same reason. A finding of inequitable conduct requires culpable intent or gross negligence in failing to disclose material information. *Atlas Powder Co. v. E.I. DuPont de Nemours & Co.*, 750 F.2d 1569, 1578 (Fed.Cir.1984); *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387 (Fed.Cir.1988). Gross negligence in turn requires "willful, wanton, or reckless misconduct, or evidence of utter lack of all care." *Machinery Corp. of Am. v. Gullfiber AB*, 774 F.2d 467, 473 (Fed.Cir.1985). Since the PTO found that the prior art relied on by AEV in this case raises no new issues of patentability, and therefore is not material, the applicant's failure to cite it to the PTO does not constitute inequitable conduct. Further, defendant produced no evidence to suggest that either the inventor or the patent agents or patent attorneys handling the patent application had any knowledge of any of the patents submitted by the defendant. Defendant's proof consisted only of submitting the patents to the Court without testimony.

24. Under 35 U.S.C. § 271, anyone who makes, uses, or sells a patented invention, or who induces another to do so, without the authorization of the patent owner is liable for infringement.

25. The top-entry ball valve made and sold by AEV falls directly within the claims of the '055 patent. The engineer who worked on the AEV valve design has admitted that each element of the claims of the '055 patent is present in the AEV valve. In fact, the evidence shows that AEV set

out to copy the design of the plaintiff's valve, and that it succeeded in doing so. The AEV valve therefore infringes the claims of the '055 patent.

26. AEV contends that claim 8 of the '055 patent is not infringed because, in essence, the claim does not describe AEV's valve. Claim 8 is a "means" claim, as to which the patent act provides:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112.

27. In applying the language of § 112, "the sole question is whether the single means in the accused device which performs the function stated in the claim is the same as or an equivalent of the corresponding structure described in the patentee's specification as performing that function." *D.M.I. Inc. v. Deere & Co.*, 755 F.2d 1570, 1575 (Fed.Cir.1985). The evidence shows that the AEV valve performs the same function as stated in claim 8 of the '055 patent, and that it does so by means equivalent to the structure described in the specification of that patent. Accordingly, the AEV valve infringes claim 8 of the '055 patent, as well as the other claims of that patent.

28. The willfulness of an act of infringement is determined by examining the totality of the circumstances. *Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 979 (Fed.Cir.1986) (citing *Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1577 (Fed.Cir.1983)). The circumstances in this case show (1) that AEV hired an engineering firm to copy the plaintiff's valve design, and (2) that AEV did not get a written opinion of counsel regarding the validity and infringement of the '055 patent after it was notified of that patent or after this lawsuit was filed. These facts are sufficient to establish willful infringement. There is an affirmative duty to obtain a validity and infringement opinion after receiving notice of a relevant patent. *See, e.g.*, *Great Northern Corp. v. Davis Core & Pad Co.*, 782 F.2d 159, 166–67 (Fed.Cir. 1986); *see also CPG Prods. Corp. v. Pegasus Luggage, Inc.*, 776 F.2d 1007, 1014–15 (Fed.Cir.1985).

29. The plaintiff is entitled to an injunction against further infringement of the '055 patent by AEV. 35 U.S.C. § 283. In addition, the plaintiff is entitled to damages "adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. The court may increase the damages "up to three times the amount found or assessed." *Id.* In addition, the court may award reasonable attorneys' fees to the prevailing party in an "exceptional" case. 35 U.S.C. § 285.

30. In assessing damages, a court may award damages greater than a reasonable royalty so that the award is "adequate to compensate for the infringement." *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1563 (Fed.Cir.1983). The court also may award damages greater than the infringer's net profits resulting from the infringement. *Radio Steel & Mfg. v. MTD Prods.*, 788 F.2d 1554, 1557 (Fed.Cir.1986). As one court said:

The setting of a reasonable royalty after infringement cannot be treated, as it was here, as the equivalent of ordinary royalty negotiations among truly "willing" patent owners and licensees. That view would constitute a pretense that the infringement never happened. It would also make an election to infringe a handy means for competitors to impose a "compulsory license" policy upon every patent owner.

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir. 1978).

31. AEV deliberately set out to copy the plaintiff's valve and failed to take steps to ameliorate the infringement after it was notified of the '055 patent. Since no reason appears here that would justify the

denial of such an award, the plaintiff will be awarded treble damages and attorneys' fees on its claim of patent infringement. The plaintiff also will be awarded prejudgment and postjudgment interest from the date of infringement to the date of payment of the judgment. *See General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983); *Bio-Rad Labs. v. Nicolet Instrument Corp.*, 807 F.2d 964 (Fed.Cir.1986).

32. The Court finds that a reasonable royalty under the '055 patent would be 5% of valve sales. Plaintiff is therefore entitled to 5% of AEV's infringing valve sales which is $287,970.10.

### C. *False Patent Marking by AEV.*

■ 33. AEV is guilty of false marking under 35 U.S.C. § 292(a). AEV has admitted that it used the words "patent pending" in an advertising brochure for its infringing valve. AEV contends, however, that it did not act for the purpose of deceiving the public. Such a purpose can be inferred from the circumstances of AEV's use of that term in connection with its copy of the plaintiff's patented valve, and its continued use in subsequent printings of its brochure even after this suit was filed. AEV shall be fined $500, one-half to go to the plaintiff and one-half to go to the United States under 35 U.S.C. § 292(b).

### D. *Copyright Infringement by AEV.*

■ 34. Copyright infringement is shown by establishing (1) ownership of a copyright, and (2) copying by the defendant. *Plains Cotton Cooperative Assoc. of Lubbock, Texas v. Goodpasture Computer Serv., Inc.*, 807 F.2d 1256, 1260 (5th Cir.1987); *Ferguson v. National Broadcasting Co.*, 584 F.2d 111, 113 (5th Cir. 1978).

■ 35. The plaintiff's copyright registration for its brochure constitutes prima facie evidence of the validity of the copyright and its ownership by the plaintiff, and the burden is on AEV to overcome these presumptions. *See Apple Computer v. Formula International*, 725 F.2d 521, 523 (9th Cir.1984); *see also Tennessee Fa-*

bricating Co. v. Moultrie Mfg. Co., 421 F.2d 279, 282 (5th Cir.1970) (decided under 1909 Copyright Act). AEV has failed to offer any evidence to show that the plaintiff's copyright is not valid. The only issue therefore is whether AEV has infringed that copyright by copying from the plaintiff's brochure.

■ 36. "Copying" is established by showing (1) that the accused infringer had *access* to the copyrighted work, and (2) that there is a *substantial similarity* between the relevant parts of the accused and the copyrighted works. *Plains Cotton Coop.*, 807 F.2d at 1260; *Ferguson*, 584 F.2d at 113. However, where the relevant parts of the two works are so strikingly similar as to preclude the possibility of independent creation, copying is established even without a showing of access. *Id.*

■ 37. In the present case, it is undisputed that AEV had access to the plaintiff's copyrighted brochure, since the brochure was publicly distributed. Likewise, there is a substantial similarity between the relevant portions of the two brochures. On comparing the two works, the Court finds that an "average lay observer" would recognize the AEV brochure as having been copied from the plaintiff's copyrighted brochure. *See Ideal Toy Corp. v. Fab-Lu Ltd.*, 360 F.2d 1021, 1022 (2nd Cir.1966). The Court may act as an "average lay observer" for this purpose. *Evans Newton, Inc. v. Chicago Sys. Software*, 793 F.2d 889, 894 (7th Cir.1986), *cert. denied*, 479 U.S. 949, 107 S.Ct. 434, 93 L.Ed.2d 383 (1986).

■ 38. The plaintiff is entitled to an injunction against AEV's further printing or distribution of its infringing brochure under 17 U.S.C. § 502(a). In addition, the plaintiff is entitled to statutory damages between $250 and $50,000 under 17 U.S.C. § 504(c); to the destruction of all copies of the AEV brochure under 17 U.S.C. § 503(b); and to its costs and attorneys' fees under 17 U.S.C. § 505. The Fifth Circuit has held that, "Although attorney's fees [under § 505] are awarded in the trial court's discretion, they are the rule rather

than the exception and should be awarded routinely." *Micromanipulator Co. v. Bough*, 779 F.2d 255, 259 (5th Cir.1985).

39. Any finding of fact that constitutes a conclusion of law or a mixed question of law and fact is incorporated as a conclusion of law.

### III. CONCLUSION

Judgment will be entered for the plaintiff in accordance with these findings of fact and conclusions of law. The judgment shall include injunctions against further infringement of the '055 patent, of the WKM trademarks, and of the copyright. The judgment shall include an award on the trademark and counterfeit issues of $251,-824.40 which shall be trebled. Additionally, plaintiff shall be awarded prejudgment interest at the rate of 9.15% as well as its costs and attorneys' fees. The judgment shall include an award of $287,970.10 as damages for the patent infringement. This amount shall be trebled and plaintiff shall be awarded their attorneys' fees and costs. Within twenty days, the plaintiff shall submit affidavits, with supporting documentation if necessary, regarding the amount of the plaintiff's attorneys' fees, and the plaintiff shall advise the Court if additional proceedings are necessary on the damages or profits to be awarded to the plaintiff.

Cooper Industries, Inc., Plaintiff,

v.

CGM Valve & Gauge, Co., Inc., and American Energy Valve Inc., Defendants.

### FINAL JUDGMENT

Judgment is entered for the Plaintiff Cooper Industries, Inc., as follows:

a) Trademark and counterfeit claims—$251,824.40

b) Patent infringement—$287,970.10

c) Copyright infringement—$25,000.00

d) Attorneys fees—$148,345.00

e) Costs of court, and

f) Prejudgment interest at 9.15% per annum; postjudgment interest at 9.15% per annum.

ORDERED that the damages set forth in (a) and (b) are trebled.

ORDERED that defendants, CGM Valve & Gauge, Co., Inc. and American Energy Valve are respectively enjoined from:

(1) further infringement to the '055 patent; and

(2) printing and distributing the AEV brochure. All copies of the AEV brochure are to be delivered to plaintiff for destruction;

ORDERED that the defendant, AEV is to pay a fine in the amount of $500, one-half to the plaintiff and one-half to the United States in accordance with Title 35 U.S.C.

Cooper Industries, Inc., Plaintiff,

v.

CGM Valve & Gauge Co., Inc., and American Energy Valve, Inc., Defendants.

### AMENDED FINAL JUDGMENT AGAINST AMERICAN ENERGY VALVE, INC.

This amended final judgment replaces the judgment originally entered on August 4, 1989, against American Energy Valve, Inc., which is vacated. The plaintiff, Cooper Industries, Inc., is awarded judgment against American Energy Valve, Inc. ("AEV"), as follows:

a) On its patent infringement claim against AEV — $287,970.10

b) On its copyright infringement claim against AEV — $ 25,000.00

c) Attorneys fees against AEV for patent infringement — $ 71,358.52

d) Attorneys fees against AEV for copyright infringement — $ 3,209.61

e) Costs of court; and

f) Prejudgment interest at 9.15% per annum on the award for patent infringement; post-judgment interest at 9.15% per annum on all of the awards. Prejudgment interest against AEV on the patent

infringement claim shall be calculated from January 1, 1988, the date of the last infringing sale shown by the records in evidence.

ORDERED that the damages set forth in (a) are trebled.

ORDERED that the defendant AEV is to pay a fine in the amount of $500, one-half to the plaintiff and one-half to the United States in accordance with Title 35 U.S.C. § 292.

ORDERED that defendant American Energy Valve, Inc., is enjoined from engaging in any of the following acts:

1. Making, using, or selling any ball valve seat or any top entry ball valve containing a valve seat identical or equivalent to the WKM valve seat which is the subject of U.S. Patent No. 4,477,055, issued October 16, 1984 (the '055 Patent);

2. Making, using, or selling any ball valve seat or top entry ball valve containing a ball valve seat identical or equivalent to the AEV top entry ball valve which was the subject of this lawsuit;

3. Otherwise infringing the '055 Patent; and

4. Making, reproducing, displaying or distributing any copies of the AEV top entry ball valve brochure which was the subject of this lawsuit, or any other items that copy or incorporate any portion of the plaintiff's copyrighted brochure entitled "Introducing a High Pressure Ball Valve That Never Has To Leave the Line ..." Within thirty (30) days after the entry of this judgment, AEV shall deliver all copies of the AEV brochure to plaintiff's counsel for destruction.

Pursuant to Rule 65, Fed.R.Civ.P., this injunction is binding upon AEV, its officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise.

ORDERED that defendant AEV shall, within thirty (30) days after the entry of this judgment, file with the court and serve on plaintiff's counsel a report in writing under oath, signed by an officer of AEV, setting forth in detail the manner and form in which AEV has complied with this injunction.