**TAYLOR MADE GOLF COMPANY, INC., d/b/a Taylor Made—Adidas Golf Company, Plaintiff,**

v.

**MJT CONSULTING GROUP, LLC, Marc W. Gunderson, and E–Golf Investments, Defendants.**

**No. CIV.A.3:01–CV–2072–P.**

United States District Court, N.D. Texas, Dallas Division.

May 30, 2003.

of summary judgment.

Elizann Carroll, Molly B. Richard, Thompson & Knight, Dallas, TX, Timothy L. Epp, Carlo F. Van den Bosch, Sheppard, Mullin Richter & Hampton, Costa Mesa, CA, for plaintiff.

William P. Weir, Fort Worth, TX, for MJT Consulting Group, LLC, defendant.

Lisa Shereen Zamaludin, Gardere Wynne Sewell, Dallas, TX, for KG Golf, defendant.

## ORDER

SOLIS, District Judge.

Now before the Court is Plaintiff's Motion for Summary Judgment, filed February 28, 2003.[1] After considering the parties' briefing, arguments, and the applicable law, the Court hereby GRANTS IN PART and DENIES IN PART Plaintiff's Motion.

### I. Factual Background

Plaintiff Taylor Made Golf Company, Inc. d/b/a Taylor Made–Adidas Golf Company ("Taylor Made" or "Plaintiff") has sued Defendants MJT Consulting Group, LLC ("MJT"), Marc W. Gunderson ("Gunderson"), and E–Golf Investments, LLC ("E–Golf") for trademark infringement and unfair competition under federal and state law.[2] Taylor Made develops, manufactures, promotes, distributes, and sells golf clubs, golf bags, and related products.[3] Plaintiff holds various trademarks and has other trademark applications currently pending.[4]

Defendant MJT Consulting Groups, LLC ("MJT") is a Texas limited liability company having its principal place of business in Arlington, Texas.[5] Defendant E–Golf Investments, LLC ("E–Golf") is also a Texas limited liability company having its principal place of business in Arlington, Texas.[6] Defendant Gunderson—an individual residing in Crowley, Texas—owns 98% of MJT.[7] He is the sole owner of E–Golf.[8] E–Golf, in turn, owns and operates two retail stores, Golf Liquidation Centers, one located in Fort Worth, the other in Dallas.[9] From August 2001 through No-

---

1. Defendants MJT Consulting Group LLC, E–Golf Investments, LLC, and Marc W. Gunderson filed their response to the motion on April 30, 2003, and Plaintiff filed its reply on May 12, 2003.

2. Plaintiff's Second Amended Original Complaint also named KG Golf and Kevin Goode as defendants. The claims against these defendants have been resolved.

3. Halleck Decl. ¶ 2.

4. Carroll Decl. ¶ 2. *See also* Pl.'s Mot., Ex. B–1 through B–6.

5. Pl.'s 1st Am. Compl. ¶ 5; Pl.'s 2d Am. Compl. ¶ 5; Def.'s Ans. ¶ 5.

6. Pl.'s 1st Am. Compl. ¶ 7; Pl.'s 2d Am. Compl. ¶ 7; Def.'s Ans. ¶ 7.

7. Pl.'s 1st Am. Compl. ¶ 6; Pl.'s 2d Am. Compl. ¶ 6; Def.'s Ans. ¶ 6; Gunderson Depo. at 24–25.

8. Gunderson Depo. at 25.

9. Pl.'s 1st Am. Compl. ¶ 18; Pl.'s 2d Am. Compl. ¶ 20; Def.'s Ans. ¶ 18; Defs.' Resp., Ex. B (Gunderson Aff.) ¶ 2. The Fort Worth store opened in June 2001 and closed on February 22, 2002. Defs.' Resp., Ex. B (Gunderson Aff.) ¶ 2. The Dallas store opened on September 14, 2001, and closed on December 31, 2001. *Id.*

vember 2001, E–Golf was operated under an agreement with Mercantile Bank of Fort Worth, Texas, for James W. Hendrix and Henry W. Simon, Jr., to be in charge of the company while Gunderson acted as an uncompensated employee.[10]

Golf Liquidation Centers advertised the sale of Taylor Made golf clubs in the *Fort Worth Star Telegram* on September 21, 2001, and the *Dallas Morning News* on October 6, 2001.[11] Neither MJT, E–Golf, nor Gunderson, however, is or has ever been an authorized distributor of Taylor Made golf products.[12] According to Gunderson, E–Golf obtained three hundred series 300 Taylor Made golf clubs (200 assembled, 100 heads only) from KG Golf.[13] E–Golf sold the clubs to the public for $250 each under a consignment agreement with KG Golf,[14] receiving $25 per club (10% of the agreed-upon sales price) on the 294 clubs sold.[15] E–Golf also sold Taylor Made clubs that had been purchased in bankruptcy sales, though those sales are not the subject of this suit.[16]

By letter dated September 21, 2001, counsel for Taylor Made informed Gunderson that it had "obtained evidence that [MJT] is presently engaged in the sale of golf clubs that purport to be genuine Taylor Made goods, which have their original serial numbers removed and/or incorporate replacement parts, including replacement shafts that were not manufactured

**10.** Defs' Resp., Ex. A (Gunderson Aff.) ¶ 31. From November 17, 2001, to February 13, 2002, E–Golf was operated under a court order; since then it has been operated by a receiver, Frank Newman. *Id.* ¶¶ 32–33.

**11.** Pl.'s 2d Am. Compl. ¶ 17; Gunderson Depo. 72 & Depo. Ex. 3 & 4. In their Answer to the First Amended Complaint, Defendants deny the allegation re-alleged in paragraph 17 of the Second Amended Complaint. Using copies of registered TAYLOR MADE marks, the ads describe Taylor Made 300, 320, and 360 series drivers with UST–Pro Force shafts for $250.00 each.

**12.** Pl.'s 1st Am. Compl. ¶ 15; Pl.'s 2d Am. Compl. ¶ 17; Def.'s Ans. ¶ 15. Kevin Goode of KG Golf claims that Taylor Made "ha[s][ ] relied upon K.G. Golf as an authorized distributor of Taylor Made merchandise, including golf clubs, from 1994 through 1996." Goode Decl. ¶ 4. Furthermore, "up until two weeks [before the execution of the Goode Declaration in September 2002], Taylor Made representatives continued to solicit and rely upon K.G. Golf to distribute Taylor Made merchandise." *Id.* ¶ 5.

**13.** Defs.' Resp., Ex. B (Gunderson Aff.) ¶ 3. Kevin Goode of KG Golf testified that he first shipped to Gunderson twenty series 300 drivers he had acquired by one Pierre Turgeon. Goode Depo. at 31. According to Goode, Turgeon told him that he had reshafted the clubs himself. *Id.* at 29. About two weeks later, Goode shipped Gunderson another 180

clubs. *Id.* at 33. Gunderson subsequently ordered unshafted club heads, offering to "do the reshafting himself ... because he could do a better job than Pierre was doing." *Id.* at 34. E–Golf contracted with a "nationally recognized industry professional repair shop ... to repair and reshaft" the club heads obtained from KG Golf. Def.'s Resp., Ex. A (Gunderson Aff.) ¶ 30.

**14.** Gunderson Dep. at 49; Defs.' Resp., Ex. A (Gunderson Aff.) ¶ 39. Other evidence suggests that KG Golf obtained assembled clubs for $165 apiece and sold them to Defendants for $200 per club. Day Depo. at 12 & 34; Goode Depo. at 62 & Depo. Ex. 9. The record also indicates that KG Golf obtained clubs and heads from a man going by the name of "Pierre Turgeon," who is not to be mistaken for the professional hockey player of the same name. Goode Depo. at 30. The evidence also indicates that KG Golf obtained club heads for $135.43 apiece and sold them to Defendants for $160 each. Carroll Aff., Ex.8; Goode Depo. at 62 & Depo. Ex. 9. According to Gunderson, KG Golf represented to him that the heads had been imported from Mexico. Defs.' Resp., Ex. A (Gunderson Aff.) ¶ 28.

**15.** Gunderson Depo. at 42 & 68; Defs.' Resp., Ex. A (Gunderson Aff.) ¶¶ 40–41; *id.,* Ex. B (Gunderson Aff.) ¶ 4. *See also* Defs.' Resp., Ex. D (Agreement for Sale on Consignment).

**16.** Defs.' Resp., Ex. A (Gunderson Aff.) ¶ 37.

by Taylor Made." [17] The letter demanded that Gunderson and MJT cease and desist selling products bearing the TAYLOR MADE mark, surrender all unauthorized products, cease and desist advertising and promoting unauthorized products, and cooperate in an investigation of the source of the unauthorized products. [18] The summary-judgment record indicates that counsel for Taylor Made spoke with counsel for Gunderson and MJT sometime before October 1, 2001, but failed to reach an agreement regarding the sale of allegedly counterfeit goods. [19]

On September 25, 2001, a Taylor Made representative visited the Golf Liquidation store in Fort Worth and purchased a Taylor Made Metalwood. [20] While at the store, he "observed approximately 100 Taylor Made 300 Series Metalwoods on display, all with UST Proforce 65 shafts and Winn grips." [21] Four days later, another Taylor made employee purchased three clubs at the Dallas store. [22] Approximately fifty Taylor Made clubs were on the sales floor, the majority of which had series 320 heads; series 300 and series 360 club heads were also available. [23] Sales representatives at both stores told these buyers that the Taylor Made clubs they viewed were "new." [24]

Brian Halleck, a manager in the Custom Club and Repair Department of Taylor Made, examined the golf clubs to determine whether they were genuine. [25] He explained, "Taylor Made does not sell golf club heads and golf club shafts as separate component[s]. To the contrary, Taylor Made only places into the stream of commerce complete golf clubs with the shafts and club heads fully assembled by Taylor Made professionals." [26] According to Halleck, Plaintiff "always controls ... the 'shafting' of its clubs, pursuant to Taylor Made quality standards." [27] It is Taylor Made's practice to dispose of club heads that do not meet standard specifications as well as clubs that are damaged during the assembly process. [28] To make these discarded heads "inappropriate for future use and unattractive for sale by would be profiteers and counterfeiters, Taylor Made 'crimps' the hosel—the round metal parts in which the shafts are embedded—by crushing them with a sledgehammer." [29] Taylor Made also dents defective club heads "to render their overall appearance unattractive and inappropriate for future sale." [30] Taylor Made does not authorize the sale of its disposed products; the company uses a disposal company "to attend to their final destruction and disposal." [31]

Halleck examined the four clubs purchased from Golf Liquidation Centers and made the following findings:

17. Pl.'s 1st Am. Compl. ¶ 17, Ex. 13 at 1; Def.'s Ans. ¶ 17. The letter was directed to MJT because Gunderson had given a Taylor Made representative an MJT business card. *Id.*

18. Pl.'s 1st Am. Compl., Ex. 13 at 2.

19. *Id.*, Ex. 14.

20. Mooney Decl. ¶ 3.

21. *Id.*

22. Peck Decl. ¶¶ 2 & 4.

23. *Id.* ¶ 4.

24. Mooney Decl. ¶ 4; Peck Decl. ¶ 2.

25. Halleck Aff. ¶ 9.

26. *Id.* ¶ 4.

27. *Id.*

28. *Id.* ¶ 5.

29. *Id.* ¶ 6.

30. *Id.* ¶ 7.

31. *Id.* ¶ 8.

First, the hosels were defective and irregular, as if they had been reshaped with a hammer for purposes of fitting a round golf shaft. Second, the club heads bore multiple scratch marks, as if they had been thrown about, possibly into a recycle bin. Third, the alignment of graphics on the shaft vis-a-vis the club head was rotated by 180 degrees from standard Taylor Made specifications. Fourth, the shafts themselves included grips that are not offered on genuine Taylor Made golf clubs. Finally, the clubs employed ferrules—a cosmetic piece, used as a visual transition from the shaft to the head—that are not used on genuine Taylor Made clubs.[32] Halleck concluded that "someone had obtained defective and/or disposed Taylor Made club heads, with dented surfaces and bent hosels, reshaped the hosels, and re-shafted the club heads."[33]

Gunderson concedes that the heads shipped under the consignment agreement rattled or were dented or scratched.[34] KG Golf purportedly represented to him that "the product shipped on consignment was product which had been returned to the factory of Taylor-Made where the heads were removed, spider glue injected, and a new Proforce shaft was installed with Winn grip."[35] Gunderson also states that Kevin Goode of KG Golf verified to him that these clubs had been imported from Mexico.[36] Gunderson insists that E-Golf itself never altered Taylor Made product; rather, it contracted with a "nationally recognized industry professional repair shop . . . to repair and reshaft product supplied by KG Golf under the consignment agreement."[37] Finally, Gunderson claims that

Taylor Made woods (including 300 series clubs) can be ordered with UST shafts.[38] Taylor Made does not dispute this claim.

## II. Procedural History

On October 15, 2001, Taylor Made filed its Original Complaint against Defendants MJT and Gunderson, seeking injunctive relief and damages. On November 1, 2001, having learned through discovery that E-Golf owned Golf Liquidation Centers, Taylor Made amended its complaint to add E-Golf as a defendant. Defendants MJT, Gunderson, and E-Golf answered the First Amended Complaint on December 6, 2001. On December 11, 2001, the Court entered an order preliminarily enjoining Defendants from manufacturing or selling any products or promotional materials bearing the Taylor Made trademarks and from transferring or concealing any such products or evidence related thereto.

Plaintiff added Goode and KG Golf as defendants on January 23, 2002. These defendants answered on June 11, 2002. MJT, Gunderson and E-Golf did not file an amended answer. At Plaintiff's request, the Court extended the preliminary injunction by Order dated November 8, 2002.

Goode and KG Golf agreed to the entry of a permanent injunction against them in March 2003, and Plaintiff dismissed all claims against them at that time. Plaintiff now moves for summary judgment on its claims against the remaining defendants.

## III. Standard for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall

---

32. *Id.* ¶ 10.

33. *Id.* ¶ 11.

34. Defs.' Resp., Ex. A (Gunderson Aff.) ¶ 17.

35. *Id.* ¶ 20.

36. *Id.* ¶ 28.

37. *Id.* ¶ 30.

38. *Id.* ¶¶ 24 & 15.

be rendered when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[39] The moving party bears the burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial, and pointing out those portions of the record that demonstrate such an absence.[40] When the moving party bears the burden of proof on a matter, "[it] must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in [its] favor."[41] The nonmoving party may but need not present evidence casting doubt on the sufficiency of the moving party's proof. Summary judgment must be denied if a genuine issue of material fact remains in spite of the evidence traduced by the moving party. All evidence and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion.[42] The Court has no duty to search the record for triable issues.[43]

## IV. Trademark Infringement

Plaintiff moves for summary judgment on its claim of trademark counterfeiting and infringement under § 32 of the Lanham Act.[44] Plaintiff contends that Defendants' sale, offering for sale and advertising of reshafted clubs bearing the Taylor Made mark constitutes unlawful counterfeiting of Plaintiff's trademarks. It is undisputed that any trademarks at issue were registered (or protected under an intent-to-use application), that Defendants used Taylor Made marks in interstate commerce, that Defendants sold products bearing registered Taylor Made marks, that Defendants used registered Taylor Made marks in advertisement, and that Defendants themselves were not authorized to distribute Taylor Made products. The only elements in dispute are (1) whether the marks on the clubs constitute reproductions, counterfeits, copies or colorable imitations of genuine marks and (2) whether there is a likelihood of confusion.

**39.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**40.** *Id.*

**41.** *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986) (emphasis original).

**42.** *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

**43.** *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998).

**44.** Section 32(1) of the Lanham Act is codified at 15 U.S.C. § 1114(1), which reads in pertinent part as follows:

Any person who shall, without the consent of the registrant
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

Also in dispute is the applicability of trademark law to the facts at hand. It is with this last issue that the Court begins.

### 1. Does the Exhaustion Doctrine Apply?

Defendants argue that their activities are protected by the "first sale" or "exhaustion" doctrine. This doctrine holds that "the trademark protections of the Lanham Act are exhausted after the trademark owner's first authorized sale of that product."[45] Regardless whether the defendant was authorized by the producer to sell the product, a first or subsequent purchaser's resale of genuine goods under the producer's trademark is neither infringement nor unfair competition.[46] The theory behind the resale rule is this: when a purchaser "does no more than stock, display, and resell a producer's product,"[47] "consumers are not confused as to the origin of the goods" because "the origin has not changed ..."[48] Conduct must go beyond "merely stocking and reselling ...

to support a cause of action for infringement."[49]

Plaintiff argues that summary judgment is appropriate because "Defendants do not present evidence of an authorized sale of any defective Taylor Made products, let alone a sale by Taylor Made of the club heads that Defendants re-shafted and that are the issue of this lawsuit," adding that "[s]peculation and supposition [are] not evidence."[50] Plaintiff misconceives the allocation of burdens. The exhaustion or first-sale rule is not an affirmative defense. Rather, it defines an area of commerce beyond the reach of trademark law.[51] Plaintiff bears the burden of proving that § 32 of the Lanham Act applies to Defendants' actions. To fend off Plaintiff's motion for summary judgment, Defendants may invoke the defense to cast doubt on the sufficiency of Plaintiff's evidence, but it remains Plaintiff's burden to persuade the Court that the summary-judgment evidence demonstrates beyond peradventure

---

**45.** *Davidoff & Cie, SA v. PLD Int'l Corp.*, 263 F.3d 1297, 1301 (11th Cir.2001). *See also Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 301 n. 4 (3d Cir.1998); *Sebastian Int'l v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1076 (9th Cir.1995); *Montblanc–Simplo GmbH v. Staples, Inc.*, 172 F.Supp.2d 231, 236 (D.Mass.2001);

**46.** *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085 (9th Cir.1998).

**47.** *Sebastian*, 53 F.3d at 1076. *See also Paccar Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243, 257 (6th Cir.2003).

**48.** *Davidoff & Cie*, 263 F.3d at 1301 (citing *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 590 (5th Cir.1993); *NEC Electronics v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir.1987) & *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085 (9th Cir.1998)).

**49.** *Sebastian*, 53 F.3d at 1076 (citing *Matrix Essentials*, 988 F.2d at 593; *Bandag, Inc. v.*

*Al Bolser's Tire Stores*, 750 F.2d 903 (Fed.Cir. 1984) & *Stormor, a Div. of Fuqua Indus. v. Johnson*, 587 F.Supp. 275 (W.D.Mich.1984)). Plaintiff also argues that a defendant invoking the first-sale doctrine must "establish the chain of title to show that their authority to sell golf clubs with Taylor Made trademarks stems from the trademark holder, Taylor Made." Reply at 1–2. The cases cited by Plaintiff in support of this proposition both deal with the necessity of such proof under copyright law, and neither suggests that trademark law imposes such a burden on defendants invoking the resale rule. *See Microsoft Corp. v. Software Wholesale Club, Inc.*, 129 F.Supp.2d 995, 1008 (S.D.Tex.2000); *Microsoft Corp. v. Harmony Computers & Elec., Inc.*, 846 F.Supp. 208, 212 (E.D.N.Y.1994).

**50.** Pl.'s Reply at 3.

**51.** *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61 (2d Cir.1992) ("As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark ...").

Plaintiff's right to judgment as a matter of law.

Thus, as a threshold matter, the Court considers whether the summary-judgment evidence demonstrates that trademark law applies to Defendants' actions. The Court finds that Plaintiff has carried its burden of persuasion on this question with respect to the 100 club heads reshafted at the direction of E–Golf. As stated above, the exhaustion doctrine only applies where the seller does no more than stock and resell genuine trademarked goods. Gunderson admits that E–Golf contracted with a repair shop to reshaft the club heads. As for the assembled clubs, Goode testified at deposition that his source, Pierre Turgeon, claimed to have reshafted club heads himself.[52] This evidence, however, is hearsay and cannot support a finding that the exhaustion doctrine does not apply.

Plaintiff contends that neither the assembled clubs nor the unshafted club heads are subject to the exhaustion doctrine because "there was never an *authorized initial* sale of defective club heads by Taylor Made."[53] The record indicates that "Taylor Made does not sell golf club heads and golf club shafts as separate components."[54] Taylor Made employee Brian Halleck declared that "Taylor Made regularly disposes of golf club heads that ... do not meet its standard specifications" or "become damaged during the 'assembly' process ..."[55] Halleck further stated that "Taylor Made does not authorize the sale of its disposed products. Rather, Taylor Made uses a disposal company to attend to their final destruction and disposal."[56] Defendants contend, however, that the mere presence of these club heads in the stream of commerce proves that Plaintiff "did not dispose of all products of inferior quality," as is avowed in the Halleck Declaration, but "permitted [some] to enter the market place."[57]

The record also indicates that KG Golf obtained the clubs and club heads it consigned to E–Golf from Pierre Turgeon, who purportedly *told* Goode he had been selling 300 series clubs at a store in Carlsbad, California, "as seconds and irregulars."[58] Goode testified that he asked Turgeon whether he had permission from Taylor Made to sell the clubs; Turgeon allegedly *told* him he did not need permission.[59] Goode was asked at deposition whether he "check[ed] with any of the Taylor Made representatives that [he] knew to ask about these clubs;" Goode answered that "Jeff Skaleski had already informed us that Taylor Made sells seconds off, and demos, and refurbs as irregulars."[60] When asked whether he understood that the person from whom Turgeon obtained the club heads "had the authority of Taylor Made to be selling these club heads," Goode stated that "[i]t never came up."[61] Relying on similar hearsay testimony, Plaintiff suggests that Turgeon did not have authority to sell the club heads because he obtained the clubs from a person in Mexico who was not authorized to sell disposed-of club heads.[62]

---

**52.** Goode Depo. at 29. *See also id.* at 34 (Gunderson ordered unshafted heads because he thought he could do a better job shafting the clubs than Turgeon had been doing).

**53.** Pl.'s Reply at 3 (emphasis original).

**54.** Halleck Decl. ¶ 4.

**55.** *Id.* ¶ 5.

**56.** *Id.* ¶ 8.

**57.** Defs.' Resp. at 3.

**58.** Goode Depo. at 24.

**59.** *Id.*

**60.** *Id.* at 25.

**61.** *Id.*

**62.** Pl.'s Br. at 8. Gunderson testified to what he heard about the source of the club heads. *See* Gunderson Depo. at 54.

The only competent, undisputed summary-judgment evidence regarding the 200 assembled clubs reveals that KG Golf obtained the clubs from Turgeon and that Goode did not believe he needed authorization from Taylor Made. Plaintiff has not carried its burden of presenting evidence that shows beyond peradventure that the exhaustion or first-sale rule would not apply to the facts at hand. Summary judgment is therefore DENIED as to the 200 assembled clubs.

### 2. Are the Clubs Reshafted at the Direction of Defendants Counterfeits?

■ It is undisputed that the marks on the club heads were generated by Plaintiff. They are not, in any literal sense, fake or counterfeit marks. However, "unauthorized use of an original trademark can qualify as counterfeiting." [63] In cases involving the reconditioning of genuine trademarked goods with nongenuine parts, the courts have been willing to find the original trademark on the reconditioned product "to be 'counterfeit' within the meaning of [15 U.S.C.] §§ 1116(d) and 1127 ...," [64] although adequate disclosure of the alterations is usually sufficient to prevent confusion.[65] At least one court has found infringement where the defendant used *genuine* parts to rebuild the mark holder's machines.[66] Courts have also found that trademarked goods "[are] not truly 'genuine' unless [they were] manufactured and distributed under quality controls established by the [trademark owner]." [67]

In the case at hand, Defendant contracted with a nonparty to reshaft club heads bearing the Taylor Made mark. Plaintiff does not dispute that the shaft and grip are used on Taylor Made clubs. But the evidence is clear that Taylor Made had no opportunity to evaluate the

**63.** *Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.,* 106 F.3d 894, 900 (9th Cir.1997). *See also Gen. Elec. Co. v. Speicher,* 877 F.2d 531, 534 (7th Cir.1989) (finding no difference between unauthorized use of an original trademark and making a reproduction of the mark).

**64.** *Rolex Watch USA, Inc. v. Meece,* 158 F.3d 816, 827 (5th Cir.1998). "Counterfeit" is defined in § 1127 to mean "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." Section 1116(d) defines "counterfeit mark" for purposes of the Lanham Act's seizure remedy:
(i) a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered; or
(ii) a spurious designation that is identical with, or substantially indistinguishable from, a designation as to which the remedies of this chapter are made available by reason of section 380 of Title 36 ...

**65.** *Champion Spark Plug Co. v. Sanders,* 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947); *Singer Mfg. Co. v. Briley,* 207 F.2d 519 (5th Cir.1953).

**66.** *See Green v. Elec. Vacuum Cleaner Co.,* 132 F.2d 312 (6th Cir.1942).

**67.** McCarthy ON TRADEMARKS AND UNFAIR COMPETITION § 25:42 (4th ed.2002) (citing *El Greco Leather Prods. Co. v. Shoe World, Inc.,* 806 F.2d 392, 395 (2d Cir.1986)). *See also Shell Oil Co. v. Commercial Petroleum, Inc.,* 928 F.2d 104 (4th Cir.1991); *Polymer Tech. Corp. v. Mimran,* 37 F.3d 74 (2d Cir.1994); *Adolph Coors Co. v. A. Genderson & Sons, Inc.,* 486 F.Supp. 131, 135 (D.Colo.1980). *But see Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.,* 988 F.2d 587, 591 (5th Cir.1993) (indicating that the "common thread" of these cases is the presence of or potential for defects not readily detectable by consumers). *Matrix Essentials* is distinguishable from the case at hand because the products had been produced by the plaintiff, whereas here the clubs were shafted by someone other than Taylor Made. *See id.* at 589.

quality of the reshafted clubs before they were offered for sale. An examination of the club heads by an employee "familiar with Taylor Made's rigid quality standards, and the process by which Taylor Made assembles its golf clubs prior to commercial distribution" indicated that they failed to meet standard specifications, were of "substantially inferior quality," and would ordinarily have been destroyed.[68] There is evidence that incognito Taylor Made representatives were told that the club heads had been reshafted,[69] but the evidence does not indicate whether Defendants labeled the clubs as having been shafted by someone other than Taylor Made.

This Court finds that there is no genuine fact issue concerning the genuineness of the marks on the club heads reshafted at the direction of Defendants. These marks, as a matter of law, are counterfeits.

### 3. The Counterfeit Marks Are Likely to Confuse Consumers

■ "In determining the likelihood of confusion, the district court must apply the 'digits of confusion' test."[70] Thus, the Court considers the following nonexhaustive list of factors in determining whether Defendants' sale or offering for sale or advertisement of reshafted clubs bearing the TAYLOR MADE mark creates a likelihood of confusion:

(1) the type of trademark allegedly infringed,

(2) the similarity between the two marks,

(3) the similarity of the products or services,

(4) the identity of the retail outlets and purchasers,

(5) the identity of the advertising media used,

(6) the defendant's intent,

(7) any evidence of actual confusion,

(8) the degree of care employed by consumers,

(9) the extent and nature of the changes made to the product,

(10) the clarity and distinctiveness of the labeling on the rebuilt product, and

(11) the degree to which any inferior qualities associated with the reconditioned product would likely be identified by the typical purchaser with the manufacturer.[71]

"No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these 'digits of confusion.' ... In addition to the listed factors, a court is free to consider other relevant factors in determining whether a likelihood of confusion exists."[72]

68. Halleck Decl. at ¶¶ 12 & 11.

69. *See* Mooney Decl. at 2; Peck Decl. at 2. *See also* Gunderson Depo. at 57 ("They are sold as reshafts, though, new clubs reshaft. Everybody knows they're reshafts."). Plaintiff's deposition excerpts do not include Gunderson's response to the question of how everybody knows this.

70. *Sunbeam Prods., Inc. v. W. Bend Co.*, 123 F.3d 246, 257 (5th Cir.1997). *See also Rolex Watch USA, Inc. v. Meece*, 158 F.3d 816, 831 (5th Cir.1998) (finding it error for district court not to consider and weigh all the digits of confusion).

71. *See Elvis Presley Enterp., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir.1998) (identifying first seven factors); *Sunbeam Prods.*, 123 F.3d at 246 (adding eighth factor); *Brandtjen & Kluge, Inc. v. Prudhomme*, 765 F.Supp. 1551, 1566–67 (N.D.Tex.1991) (Fitzwater, J.) (adopting factors peculiar to cases involving rebuilt or repaired goods); *Neles–Jamesbury, Inc. v. Valve Dynamics, Inc.*, 974 F.Supp. 964, 970 (S.D.Tex.1997) (following *Brandtjen* ).

72. *Elvis Presley*, 141 F.3d at 194.

Plaintiff has not systematically addressed these factors, relying heavily on its contention that the clubs are counterfeits and that Defendants "act to foster ... confusion." Plaintiff notes that salespersons represented that the clubs were new Taylor Made clubs, that Defendants were aware of deficiencies in the heads, that Defendants used TAYLOR MADE marks in advertisements because the mark is a "drawing card that brings people in there." [73] The defendants do not join the issue of confusion, but are content to rely on the first-sale doctrine in defending their actions.

***Type of Mark Allegedly Infringed.*** This factor refers to the strength of the mark: the stronger the mark, the greater protection.[74] Because Plaintiff's trademarks have been registered with the United States Patent and Trademark Office (or were subject to protection under an intent-to-use application), they are entitled to trademark protection by virtue of its status as a registrant.[75] Plaintiff has presented no other evidence or arguments concerning the strength of its mark.

***Similarity Between the Two Marks and Similarity of Products.*** There is no evidence that the defendants altered any marks on the club heads. The clubs reshafted at the direction of E–Golf are substantially similar to genuine clubs marketed by Plaintiff and they compete with those goods.

***Identity of Retailers and Purchasers.*** Defendants are not authorized to sell new Taylor Made products, although they do sell Taylor Made products purchased from bankruptcy liquidation sales. Defendants admit that the TAYLOR MADE mark is a "draw" for customers, indicating that there may be an identity of purchasers.

***Identity of Advertising Media.*** The summary-judgment evidence indicates that Defendants use print media (newspapers) to advertise their goods. Plaintiff has presented no other evidence on this point.

***Defendant's Intent.*** "Intent to pass off one's goods as those of another can provide compelling evidence of likelihood of confusion." [76] Defendant Gunderson admits that the TAYLOR MADE mark was used in advertisements in order to bring people to his retail stores. Thus, his intent is to capitalize on the goodwill and reputation of Taylor Made golf clubs to increase traffic and sales. The evidence also shows that Defendant Gunderson is familiar with the legal protections afforded the owner of a trademark, as he helped secure trademarks for a former business.

***Evidence of Actual Confusion.*** "Although evidence of actual confusion is not necessary to a finding of likelihood of confusion, it is nevertheless the best evidence" on this matter.[77] Though there is evidence that consumers purchased the clubs, and that some returned the clubs due to defects, Plaintiff has not presented evidence of actual confusion, such as affidavits from consumers who believed they were buying genuine Taylor Made products.

***Extent and Nature of Changes Made to Product.*** Defendant obtained club

---

73. *See* Pl.'s Br. at 10–11 (quoting Gunderson Depo. at 72).

74. *Elvis Presley,* 141 F.3d at 201.

75. *See Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3,10 (5th Cir.1974); *Quantum Fitness Corp. v. Quantum Lifestyle Ctrs., L.L.C.,* 83 F.Supp.2d 810, 817 (S.D.Tex. 1999).

76. *Brandtjen & Kluge, Inc.,* 765 F.Supp. at 1568.

77. *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir.1980); *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 704 (5th Cir. Unit A 1981).

heads that were originally manufactured by Plaintiff and had them reshafted with UST Pro Force shafts. Plaintiff does not dispute Gunderson's claim that it sells clubs with such shafts. The evidence shows that serial numbers have been partially or entirely scratched off. Hosels were judged by Plaintiff to be defective and irregular. Paint was scratched from apparent abuse or wear. The reshafted clubs have ferrules, which are, according to Plaintiff, not present on genuine Taylor Made clubs. Club heads were rotated 180 degrees from standard specifications. Plaintiff has not presented any summary-judgment evidence suggesting that the reshafted clubs perform differently than a genuine Taylor Made club, although there is evidence that clubs were returned after the head came off.

***Clarity and Distinctiveness of the Labeling.*** Courts have long held that "repaired or reconditioned goods bearing the original trademark must be clearly marked to show that they have been repaired or reconditioned."[78] There is evidence that Defendants informed customers that the clubs at issue had Pro Force shafts. A salesperson told an undercover Taylor Made representative that the club heads had been reshafted by someone other than Taylor Made. There is no evidence that the clubs were labeled to convey this information.

***Degree of Care Employed by Consumers; Degree to Which Inferior Qualities Would be Associated with Plaintiff.*** Evidence that the typical consumer is sophisticated can weigh against a finding that the defendant's use of a mark is likely to confuse consumers.[79] Further, "[w]hen a product is of relatively high cost, the customer presumably is more likely to investigate before purchasing."[80] The record reflects that Defendants offered the clubs for sale and sold clubs for $250 per club. Plaintiff provides no evidence to indicate that this cost is "relatively high" or that golfers are particularly sophisticated in their purchasing of clubs. Furthermore, Plaintiff has provided no evidence indicating that the consumers are likely to associate any inferior quality of these clubs with Taylor Made.

***Conclusion***

■ Considering all the factors, the Court finds that Plaintiff has demonstrated a likelihood of confusion beyond peradventure. No reasonable person could find otherwise.

There being no genuine issue of material fact, the Court finds that Defendant E–Golf is liable to Plaintiff as a matter of law for trademark infringement with respect to the 100 club heads it obtained from KG Golf. Plaintiff presented no evidence that MJT Consulting engaged in any infringing activity and is not entitled to summary judgment against MJT.

## V.  Unfair Competition

### A.  Lanham Act

■ Plaintiff also moves for summary judgment on its claim arising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), which imposes liability on any person who, in connection with any goods . . . uses in commerce a word, term, name, symbol, a false designation of origin, or a false or misleading description or representation of fact, which is likely to deceive

**78.**  *Joy Mfg. Co. v. CGM Valve & Gauge Co.,* 730 F.Supp. 1387, 1395 (S.D.Tex.1989) (citing, *inter alia, Champion Spark Plug Co. v. Sanders,* 331 U.S. 125, 130, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947) & *Singer Mfg. Co. v. Briley,* 207 F.2d 519, 522 (5th Cir.1953)).

**79.**  *Brandtjen & Kluge,* 765 F.Supp. at 1571.

**80.**  *Id.* at 1571–72.

or cause confusion or mistake as to the affiliation, connection, or association of such person with another person or as to the origin, sponsorship or approval of his or her goods, services or commercial activities by another person.[81] "Persons bringing an action pursuant to this provision must demonstrate that (1) the defendants made false statements of fact about [the goods]; (2) those statements deceived, or had the potential to deceive, a substantial segment of potential customers; (3) the deception was material, in that it tended to influence purchasing decisions; (4) the defendants caused their products to enter interstate commerce; and (5) the claimant has been or is likely to be injured as a result."[82] In Lanham Act unfair-competition suits, "[t]he central inquiry ... is 'whether the defendant is passing off his goods or services as those of the plaintiff by virtue of substantial similarity between the two, leading to confusion on the part of potential customers.' "[83] Defendant's intent is not a necessary element of a claim under § 43(a).[84] "[T]he touchstone of a section 1125(a) unfair competition claim is whether the defendant's actions are 'likely to cause confusion.' "[85]

Summary judgment cannot be granted with respect to the assembled clubs obtained by Defendants because, as discussed above, there is a fact question concerning the applicability of the exhaustion doctrine.[86] As for the club heads shafted at the direction of E–Golf, the summary-judgment evidence demonstrates beyond peradventure that Defendant E–Golf violated § 43(a) of the Lanham Act and summary judgment is GRANTED on this claim. Plaintiff presented no evidence that Defendant MJT Consulting engaged in any activities made unlawful by § 43(a); summary judgment is DENIED with respect to the claim that MJT violated § 43(a).

### B. Common–Law Unfair Competition

Summary judgment is also proper on Plaintiff's claim of common-law unfair competition, at least with respect to the club heads shafted at the direction of E–Golf. "Unfair competition is a form of unlawful business injury which consists essentially, in the passing off or attempting to pass off on the public, the goods or business of one person as and for the business of another."[87] In cases involving a registered trademark, plaintiffs must "demonstrate that the public is likely to be confused or deceived."[88] No proof of defendant's intent to deceive is required.[89] Courts eval-

---

81. *King v. Ames,* 179 F.3d 370, 373 (5th Cir. 1999).

82. *Id.* at 373–374 (citing *Taquino v. Teledyne Monarch Rubber,* 893 F.2d 1488, 1500 (5th Cir.1990)).

83. *Sun–Fun Prods., Inc. v. Suntan Research & Dev., Inc.,* 656 F.2d 186, 192 (5th Cir.1981) (quoting *Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1010 (5th Cir.1975)).

84. *Volkswagenwerk Aktiengesellschaft v. Rickard,* 492 F.2d 474, 478 (5th Cir.1974).

85. *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.,* 988 F.2d 587, 592 (5th Cir.1993).

86. *Enesco Corp. v. Price/Costco Inc.,* 146 F.3d 1083, 1085 (9th Cir.1998) ("Under the doctrine, resale by the first purchaser of the original article under the producer's trademark is generally neither trademark infringement *nor unfair competition.*").

87. *Oliver Gintel, Inc. v. Koslow's, Inc.,* 355 F.Supp. 236, 239 (N.D.Tex.1973).

88. *King–Size, Inc. v. Frank's King Size Clothes, Inc.,* 547 F.Supp. 1138, 1163 (S.D.Tex.1982) (citing, *inter alia, McCarley v. Welch,* 170 S.W.2d 330, 332 (Tex.Civ.App.— Dallas 1943)).

89. *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1191 (5th Cir.1980); *Line Enterps., Inc. v. Hooks & Matteson Enter., Inc.,* 659 S.W.2d 113, 117 (Tex.App.—Amarillo 1983).

uating likelihood of confusion in claims based on Texas common-law unfair competition have relied on the "digits of confusion" analysis used for federal trademark-infringement suits.[90] The Court has already found that the clubs reshafted at the direction of E–Golf were counterfeits, and, insofar as it is undisputed that Defendant E–Golf offered for sale or sold the clubs to the public, it is therefore plain that Defendant E–Golf was attempting to pass off the counterfeits as goods of Taylor Made. The Court has also found a substantial likelihood of confusion. Therefore, Plaintiff is entitled to judgment as a matter of law on its common-law claim of unfair competition against Defendant E–Golf. Summary judgment is GRANTED with respect to the 100 club heads assembled at the direction of E–Golf and DENIED as to the 200 clubs already assembled when acquired by E–Golf. Plaintiff presented no evidence of any unfair competition on the part of Defendant MJT; therefore, summary judgment is DENIED with respect to the claim that MJT is liable for common-law unfair competition.

## VI. Gunderson's Liability

■ Plaintiff asserts that Defendant Gunderson should be held personally liable for contributing to trademark infringement.[91] Plaintiff also contends that Gunderson should be held personally liable under the law of agency.[92]

It is unnecessary to consider whether Gunderson may be held liable under these theories of secondary liability because he can be held personally liable for his own acts of infringement.[93] As the Fifth Circuit put it,

> There can be no doubt but that a trademark ... can be infringed by an individual. It is infringed when an individual performs the act or does the things that the patent or trademark law protects against. The fact that the persons thus acting are acting for a corporation also, of course, may make the corporation liable under the doctrine of respondeat superior. It does not relieve the individuals of their responsibility.[94]

Thus, "a corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing of the corporate veil." [95] An individual can be held personally liable if he "actively and knowingly caused the infringement." [96]

90. *See, e.g., Neles–Jamesbury, Inc. v. Valve Dynamics, Inc.,* 974 F.Supp. 964, 970 (S.D.Tex. 1997).

91. Pl.'s Br. at 12 (citing *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.,* 955 F.2d 1143 (7th Cir.1992) & *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259 (9th Cir. 1996)).

92. *Id.* at 12–13 (citing *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421 (3d Cir.1994)).

93. *Donsco, Inc. v. Casper Corp.,* 587 F.2d 602, 606 (3d Cir.1978).

94. *Mead Johnson & Co. v. Baby's Formula Serv., Inc.,* 402 F.2d 19, 23 (5th Cir.1968). *See also Chanel, Inc. v. Italian Activewear of Fla., Inc.,* 931 F.2d 1472, 1477 (11th Cir. 1991); *Polo Fashions, Inc. v. Craftex, Inc.,* 816 F.2d 145, 149 (4th Cir.1987); *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1021 (9th Cir.1985).

95. *Babbit Elec., Inc. v. Dynascan Corp.,* 38 F.3d 1161, 1184 (11th Cir.1994).

96. *Chanel,* 931 F.2d at 1477. The Court does not read *Chanel* to impose an extrastatutory requirement of proof that the defendant knew that the prohibited acts constituted infringement for ordinary liability to attach; rather, proof that the defendant knowingly committed the acts prohibited by the statute will suffice to make him personally liable.

It is undisputed that Gunderson is the sole member of E–Golf. Even though he "was not in charge of operating the company" at the times in question, he procured the reshafted clubs on behalf of E–Golf, discussed their source, inspected the clubs, and signed the consignment agreement.[97] Indeed, the distinction between E–Golf and Gunderson sometimes blurs in his deposition testimony.[98] The evidence demonstrates beyond peradventure that Gunderson was the "moving, active, conscious force[ ] behind [E–Golf]."[99] He was a "principal architect" of E–Golf's infringing activity.[100] Summary judgment is GRANTED against Defendant Gunderson to the same extent as it has been granted against E–Golf.

## VII. Damages

■ The Lanham Act allows an aggrieved party to recover damages, profits, costs of court, and, in exceptional cases, reasonable attorneys' fees.[101] Treble damages or profits, whichever is greater, and reasonable attorneys' fees are available upon a showing of willful conduct by the defendant.[102] In cases involving the willful use of a counterfeit mark, the plaintiff may elect an award of statutory damages of "not more than $1,000,000 per counterfeit mark per type of goods ... sold, offered for sale, or distributed, as the court considers just."[103] Absent a showing of willful infringement, statutory damages between $500 and $100,000 per type of good sold, offered for sale or distributed may be awarded.[104] Plaintiff seeks "an award of statutory damages to the fullest extent such damages are available."[105]

The summary-judgment evidence demonstrates beyond peradventure that Defendants E–Golf and Gunderson sold, offered for sale, and/or distributed one hundred counterfeit Taylor Made clubs. Plaintiff is therefore entitled to elect a statutory damages award. Because only one type of goods (golf clubs) is at issue, Plaintiff is entitled to one award of statutory damages per counterfeit mark.

Pointing to the fact that it has registered six marks, Plaintiff contends that six different marks were infringed and that the Court should award up to $600,000 for ordinary infringement or up to $6 million for willful infringement. The summary-judgment record indicates that three TAYLOR MADE marks appeared on the principal register at the time of the infringing activity; Plaintiff had indicated its intent to use the other three.[106] However, Plain-

---

97. Defs.' Resp., Ex. A (Gunderson Aff.) ¶ 5; *id.*, Ex. D; Gunderson Depo. at 42–43, 47, 52–56, 61 & 72; Goode Depo. at 30–34, 39, 62 & Depo. Ex. 9.

98. *E.g.*, Gunderson Depo. at 57 ("Some of the returns that I received ..., I've sent out ..."); *id.* at 68 ("If I purchased them ..."). The Court acknowledges that these quotations do not refer to the counterfeit clubs involved in this case.

99. *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F.Supp. 899, 913 (E.D.N.Y.1988)(citing *Polo Fashions, Inc. v. Branded Apparel Merch.*, 592 F.Supp. 648 (D.Mass. 1984)).

100. *Brittingham v. Jenkins*, 914 F.2d 447, 458 (4th Cir.1990).

101. 15 U.S.C. § 1117(a).

102. *Id.* § 1117(b).

103. *Id.* § 1117(c)(2).

104. *Id.* § 1117(c)(1).

105. Pl.'s Br. at 13.

106. Carroll Decl., Exs. 1–6. Mark no. 2,556,111 bears a registration date of April 2, 2002, mark no. 2,557,110 bears a registration date of April 2, 2002, and mark no. 2,613,012 bears a registration date of August 27, 2002. Intent to use allowances were permitted on October 17, 2000 (mark no. 2,613,012), and February 27, 2001 (mark nos. 2,556,111 and 2,557,110).

tiff has presented no evidence of which marks were on the counterfeit clubs. The Court therefore cannot tell how many marks were actually counterfeited. To the extent that more than one mark was counterfeited, summary judgment must be DENIED on the question of damages.[107]

Though a fact question remains concerning the number of registered marks counterfeited, it is appropriate for the Court to consider whether Plaintiff is entitled to summary judgment on the question of willful counterfeiting and its entitlement to statutory damages under 15 U.S.C. § 1117(c)(2). At least one court in this district has predicated the availability of statutory damages under this subsection on proof that the defendant intentionally used the mark knowing it to be a counterfeit.[108] MCCARTHY ON TRADEMARKS suggests that "[t]he body of case law developed to interpret the similar statutory damages provision in copyright law should prove helpful in applying the counterfeiting statutory damages option."[109] The Fifth Circuit has held that a "defendant acts 'willfully' within the meaning of [the statutory damages provision of the Copyright Act] ... if he knows his actions constitute an infringement; the actions need not have been malicious."[110] Some cases, citing Fifth Circuit case law interpreting the profits provision of the Lanham Act, have held that the term "willful infringement" connotes an intent to deceive.[111] Regardless which standard applies, it has also been held that willfulness can be inferred from a defendant's continued infringement after being given notice.[112]

Plaintiff has not presented evidence that Gunderson or E–Golf knew that reshafting the club heads amounted to counterfeiting. The evidence also does not demonstrate an intent to deceive. In seeking summary judgment on the issue of willfulness, Plaintiff relies heavily on the fact that its counsel "contacted [Defendants] regarding the sale of counterfeit clubs by demand letter" dated September 21, 2001, and that, "[a]fter receipt of the letter, Defendant's counsel, William P. Weir contacted Plaintiff's counsel by telephone [sometime before October 1, 2001]."[113] It is undisputed that representatives from Taylor Made purchased counterfeit clubs at the Fort Worth retail store on September 25, 2001, and the Dallas store on September 29, 2001. The

---

107. The Court acknowledges the apparent inconsistency in finding Defendants E–Golf and Gunderson liable for infringement in the absence of concrete evidence of the number of Taylor Made marks infringed. However, the record is replete with evidence that the clubs were recognized as and marketed as Taylor Made clubs and Defendants do not defend the summary-judgment motion on grounds that Plaintiff failed to introduce evidence that its marks were on the clubs. Even considering the evidence in the light most favorable to the nonmoving party, the Court cannot infer that no marks were used. Such an inference would be palpably unreasonable.

108. *Rolex Watch U.S.A., Inc. v. Meece*, No. 3:95–CV–1058–T, 2000 WL 33582648, *4, 2000 U.S. Dist. LEXIS 20583, at *13 (N.D.Tex. Jan. 25, 2000). No proof of intent to deceive was required. *Id.*

109. McCarthy on Trademarks and Unfair Competition § 30:95 (4th ed.2002).

110. *Broadcast Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 236 (5th Cir.1988).

111. *E.g., SecuraComm Consulting, Inc. v. Securacom, Inc.*, 166 F.3d 182, 187 (3d Cir.1999) (citing *Rolex Watch USA, Inc. v. Meece*, 158 F.3d 816, 823 (5th Cir.1998), in turn quoting *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1402 (9th Cir.1993)).

112. *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F.Supp.2d 567, 583 (E.D.Pa.2002).

113. Pl.'s 1st Am. Compl. ¶ 17; Pl.'s 2d Am. Compl. ¶ 19; Defs.' Ans. ¶ 17. *See also* Pl.'s 1st Am. Compl., Exs. 13 & 14.

summary-judgment record does not indicate when Defendants received the letter from Taylor Made's counsel. No other summary-judgment evidence has been offered to indicate that Defendants knew the clubs were counterfeits or that Defendants intended to deceive consumers. Thus, the Court cannot say that Plaintiff has demonstrated beyond peradventure that E–Golf willfully infringed Plaintiff's trademark.

Similarly, Plaintiff has not demonstrated that Defendant Gunderson engaged in any infringing activity after receiving notice about the counterfeit clubs. Thus, a fact question remains concerning the willfulness of Gunderson's participation in the sale, offering for sale, or distribution of counterfeit clubs.

In its brief, Plaintiff stated that, "[i]n the event this Court finds that a genuine issue of material fact exists as to the willfulness of [MJT, E–Golf and Gunderson], Taylor Made would request an award of statutory damages of $100,000 per counterfeit mark ..."[114] Insofar as proof is lacking on the number of marks counterfeited, the Court is unprepared to determine an appropriate statutory damages award under § 1117(c)(1).

## VIII. Attorneys' Fees

Under 15 U.S.C. § 1117(a), courts may "in exceptional cases" award reasonable attorneys' fees to the prevailing party. The Fifth Circuit has held that the exceptional case is one in which the defendant's infringement can be characterized as "malicious," "fraudulent," "deliberate," or "willful."[115] To recover attorneys' fees, the prevailing party must show "a high degree of culpability" on the part of the losing party.[116] However, the court "shall" (unless it finds extenuating circumstances) award attorney's fees "in the case of any violation of section 1114(1)(a) of this title ... that consists of intentionally using a mark or designation, knowing [that] such mark or designation is a counterfeit mark (as defined in section 1116(d) of this titled), in connection with the sale, offering for sale, or distribution of goods of services...."[117]

The Court has already found that Defendants E–Golf and Gunderson sold, offered for sale or distributed counterfeit Taylor Made clubs, as defined by 15 U.S.C. § 1116(d). The summary-judgment evidence shows that Defendants were notified that the clubs were counterfeits by letter dated September 21, 2001, and that counsel for Taylor Made spoke with counsel for Defendants sometime before October 1, 2001. Plaintiff has presented no other evidence that E–Golf or Gunderson knew that the clubs were counterfeits when they violated § 1114(1)(a). Insofar as legal and factual issues remain outstanding, the Court finds it premature to rule on attorneys' fees at this time. The issue shall be resolved at the conclusion of the trial.

## IX. Conclusion

With respect to the 100 club heads re-shafted at the direction of Defendants E–Golf and Gunderson, Plaintiff has demonstrated beyond peradventure that these two defendants sold, offered for sale, or distributed counterfeit Taylor Made clubs in violation of 15 U.S.C. § 1114(1)(a) and § 1125(a) as well as the Texas common

---

**114.** Pl.'s Br. at 17.

**115.** *Martin's Herend Imp., Inc. v. Diamond & Gem Trading USA Co.,* 112 F.3d 1296, 1305 (5th Cir.1997); *Texas Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.,* 951 F.2d 684, 697 (5th Cir.1992).

**116.** *Id.*

**117.** 15 U.S.C. § 1117(b); *Rolex Watch USA, Inc. v. Meece,* 158 F.3d 816, 824 (5th Cir. 1998).

law, and summary judgment is GRANTED as to the liability of E–Golf and Gunderson. Plaintiff is entitled to damages, costs, and a permanent injunction.

As for the 200 clubs obtained from KG Golf, a question of fact remains concerning the applicability of the exhaustion doctrine, and summary judgment is DENIED.

Plaintiff has presented no evidence upon which the Court may conclude that Defendant MJT should be held liable for any of the complained-of conduct. Summary judgment is DENIED as to the claims asserted against Defendant MJT.

Plaintiff is entitled to statutory damages, but the Court is unable to determine how many of Plaintiff's registered marks were counterfeited. Nor can the Court determine whether Plaintiff is entitled to statutory damages under § 1117(c)(2) on grounds that Defendant's willfully sold, offered for sale, or distributed counterfeit Taylor Made clubs. Summary judgment is therefore DENIED as to damages. Given the unresolved legal and factual issues, the Court declines to rule on attorneys' fees at this time.

To conclude, Plaintiff's Motion for Summary Judgment is GRANTED in PART and DENIED in PART.

**It is so ordered.**